Henry P. Gonzalez, LL.M. (HPG 9238)
RODRIGUEZ O'DONNELL
GONZALEZ & WILLIAMS, P.C.
Attorneys for DHL Global Forwarding SA (PTY) LTD.
1211 Connecticut Avenue, N.W., Suite 800
Washington, D.C. 20036
(202) 973-2980   Telephone
(202) 293-3307   Facsimile

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
PHOENIX SHIPPING CORPORATION,       :    ECF Case
                                    :
                        Plaintiff,  :    No.: 08 Civ. 6325
                                    :
        v.                          :
                                    :
DHL GLOBAL FORWARDING,              :    **DEFENDANT'S MOTION TO VACATE**
(PTY) LTD, a/k/a DHL INDUSTRIAL     :    **EX PARTE ATTACHMENT ORDER**
PROJECTS DIVISION,                  :
JOHANNESBURG                        :
                        Defendant.  :
-----------------------------------------------------------X

Pursuant to Rule E(4)(f) of the Supplemental Rules, defendant DHL Global Forwarding, SA (PTY) LTD, a/k/a DHL Industrial Projects Division, Johannesburg ("DHL GF"), respectfully moves this Court to set a date for a post-attachment hearing at the Court's earliest convenience. At the hearing, counsel for DHL GF will move the Court to immediately vacate the Ex Parte Order for the following reasons.

1.  Plaintiff presented the Court with a Complaint that was not verified as required by Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

2.  The alleged Verified Complaint contains such egregious and false statements that it cannot support an Order of Attachment by this or any U.S. District Court.

3.  That plaintiff cannot demonstrate a prima facie admiralty claim.

A. **Summary of Undisputed Facts**

On or about July 15, 2008, plaintiff Phoenix Shipping Corporation ("Phoenix" or "plaintiff"), a South African corporation, applied for an attachment of DHL GF's funds pursuant to Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") of the Federal Rules of Civil Procedure. On or about July 17, 2008, the Court issued an Ex Parte Order for Process of Maritime Attachment against DHL GF. As a result, Subsequently, $419,318.07 of DHL GF's funds were attached or restrained pursuant to the Ex Parte Order.

B. **Summary of a Rule E (4)(f) Challenge to a Rule B Attachment**

In a Rule E(4)(f) inquiry challenging a Rule B attachment, this Court held that in addition to the filing and service requirements, a plaintiff also has the burden to show that (1) it has a prima facie admiralty claim; (2) the named defendants cannot be found within the district; (3) the attached defendant's property was within the district; and (4) there is no statutory or maritime law bar to the attachment. *OGI Oceangate Transportation Co., Ltd. v. RP Logistics Pvt. Ltd. et al.*, 2007 U.S. Dist. Lexis 46841, 6-7. (S.D.N.Y. 2007). Defendant DHL GF maintains that plaintiff does not have a prima facie admiralty claim and did not verify its complaint as required by the Supplemental Rules, and the alleged verified complaint is so replete with false statements that it could not possibly support an Ex Parte Order of Attachment, in that plaintiff does not allege a prima facie admiralty claim with the required sufficiency.. Therefore, DHL GF respectfully requests that the Court immediately vacate the attachment.

C. **The Standard Prima Facie Admiralty Claims**

As the Court stated in *OGI Oceangate*, supra, Suits in admiralty are subject to Supplemental Rule E(2)(a), which provides that:

2

> In actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading.

Fed. R. Civ. P. Supp. Rule E(2)(a).

The Court further noted that, "[t]his heightened pleading standard is not some pettifogging dechnicality [sic] meant to trap the unwary, but, rather, a legal rule designed to counterbalance the unique and drastic remedies that are available in *in rem* admiralty proceedings." *OGI Oceangate Transportation Co., Ltd. v. RP Logistics Pvt. Ltd. et al.*, 2007 U.S. Dist. Lexis 46841, 6-7. (S.D.N.Y. 2007), citing *P.R. Ports Auth. v. Barge KATY-B, 427 F.3d 93, 105 (1st Cir. 2005)* (noting that "[o]rdinary notice pleading does not satisfy the stringencies of [the supplemental] rules").

As will be demonstrated below, plaintiff has failed to provide this Court with a Verified Complaint that states the circumstances from which plaintiff's claim arose with such particularity that the defendant DHL GF will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading. The Verified Complaint is replete with false statements that a motion for a more definite statement must be filed or an investigation of the facts must be had in order for DHL GF to file a responsive pleading. See Declaration of Robert Coventry, and Attachments thereto.

**D.     Plaintiff's Verified Complaint Was Not Verified and Contained False Statements**

To support its Ex Parte Order of Attachment, on or about July 15, 2008, plaintiff submitted a "Verified Complaint," supported only by an "Attorney Verification." That verification stated that the sources of the attorney's information and grounds were based on

"communications, information, and documentation provided by the attorney's client and or by solicitors representing plaintiff. The plaintiff's attorney also stated that he was making the verification because plaintiff is a foreign corporation and none of its officers are present within the Judicial District. See Attachment A, which consists of a true and correct copy of plaintiff's Verified Complaint and Attorney Verification. No other documents were presented to this Court to support the Ex Parte Order of Attachment. The alleged "Maritime Contract" that plaintiff represented to this Court formed the basis for the underlying Complaint was also not attached to the Verified Complaint.

    a.    **The False Statements in the Verified Complaint**

Plaintiff's Verified Complaint contained the following false and incorrect allegations, which should allow the Ex parte Order of Attachment to be vacated:

    1.    The Verified Complaint averred that, on or about March 25, 2008, defendant DHL Global PTY, **acting as agent** for non-party Bateman Engineered Technologies ("Bateman"), entered into a firm booking note on the CONLINEBOOKING 2000 form **with Plaintiff Phoenix, as carrier**, for the ocean transport of cargo of 1,711 tons[sic] of ball mill hells and accessories aboard the M/V COS POSPERITY from Shanghai, China to Durban, South Africa. See attached Verified Complaint ¶ 4, at 2 (Emphasis added). See also Declaration of Robert Coventry and Attachment E, thereto. This statement is clearly false since the only document that was provided to non-party Bateman and DHL GF was a CONLINE BOKKING 2000 form, which is dated March 20, 2008 (not March 25, 2008), and does not show Phoenix as carrier but rather DHL GF as the carrier. See Attachment B, which consist of a true and correct copy of CONLINE BOOKING NOTE 2000 dated March 20, 2008. See also Declaration of Robert Coventry, and Attachments thereto. It should be noted that the CONLINE BOOKING

NOTE was never signed by DHL GF or Phoenix. In fact, Phoenix's name does not appear at all in the CONLINE BOOKING NOTE.

2. Plaintiff averred that, ". . . DHL Global GF, **acting as agent** for non-party-Bateman, entered into a firm Booking Note on the CONLINEBOOKING 2000 form with Plaintiff Phoenix . . ." See Verified Complaint, ¶ 4, at 2 (Emphasis added). This is false since it was Bateman, the disclosed Principal for DHL GF, that e-mailed Phoenix and stated that it was giving the "go ahead to book 1607 cubes of cargo for the Blue Ridge Project." By plaintiff's own admission, DHL GF was "acting as an agent for non-party Bateman." Id. at 2. See also Declaration Robert Coventry, ¶ 7,8,9,10 and 20, and Attachments thereto. Again, for this reason alone, plaintiff's attachment must fail because it has averred a prima facie case against DHL GF's disclosed principal Bateman. DHL GF's limited role in the subject matter of this case represented by plaintiff's admission was that of an agent.

3. The plaintiff alleges in the Verified Complaint that, "[t]his action is brought inter alia pursuant to 9 U.S.C. §8 in order to obtain security for Plaintiff **Belli's claim** or to be made in **London arbitration** and under English law, as agreed by the parties. **Arbitration has been commenced.**" See Verified Complaint ¶ 12, at 3 (Emphasis added).

First, the allegation is obviously false because DHL GF does not know "Plaintiff Belli." Plaintiff "Belli's" name appears for the first time in the Verified Complaint in ¶ 12. DHL GF is not aware of any party in the alleged transaction subject of this suit named "Belli," and would require a Motion for a more definite statement with respect to who Plaintiff Belli is, and its involvement in this case. This in and of itself is a reason for the Court to vacate the Ex Parte Order of Attachment.

Further, plaintiff avers in ¶ 12 of the Verified Complaint that, "Arbitration has been commenced." This averment is also false because DHL GF's and its designated counsel in South Africa have stated that no arbitration proceeding has been commenced either in South Africa or London. Numerous exchanges between counsel for Phoenix and DHL GF occurred respectively and DHL GF's counsel denied that there was any agreement to arbitrate in London or Durban South Africa, much less that such arbitration had commenced. See Declaration of Robert Coventry, and Attachments thereto, at ¶ 21, page 4, 5.

4. The Verified Complaint in ¶ 17d. also refers to "London proceedings" and plaintiff knew or should have known that no such proceeding exists.

F. **CONCLUSION**

In view of the above, DHL GF again respectfully requests the Court set a hearing at the Court's earliest convenience. To that end, we attach a proposed Order to Show Cause.

By: Respectfully submitted,

*[signature]*

Henry P. Gonzalez, LL.M. (HPG 9238)
**RODRIGUEZ O'DONNELL GONZALEZ and WILLIAMS, P.C.**
1211 Connecticut Ave., N.W., Suite 800
Washington, D.C. 20036
(202) 973-2980   Telephone
(202) 293-3307   Facsimile

Attorneys for Defendant, DHL Global Forwarding, SA (PTY) LTD, a/k/a DHL Industrial Projects Division, Johannesburg

## Certificate of Service

I, Henry P. Gonzalez, hereby certify that on August 15, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM-ECF system which will send a notice of electronic filing to all participating counsel of record. Additionally, I have also served hard copies to the following:

Michael E. Unger (MU 0045)
Freehill Hogan & Mahar, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005

Additionally, a courtesy copy was sent to:

Honorable Robert J. Sullivan
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1920
New York, New York 10007-1312

_____
Henry P. Gonzalez, LLM
Rodriguez, O'Donnell
    Gonzalez & Williams, P.C.
1211 Connecticut Ave., N.W. Suite 800
Washington, DC 20036
202-973-2980        Direct Dial
202-293-3307        Facsimile

# ATTACHMENT A

JUDGE SULLIVAN                                          08 CV 6325

377-08/MEU/SL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger (MU 0045)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------
PHOENIX SHIPPING CORPORATION,          | 08 Civ _____ (___)
                                        |
                    Plaintiff,          |
                                        | **VERIFIED COMPLAINT**
    -against-                           |
                                        |
DHL GLOBAL FORWARDING (PTY) LTD,        |
a/k/a DHL INDUSTRIAL PROJECTS DIVISION, |
JOHANNESBURG,                           |
                                        |
                    Defendant.          |
---------------------------------------------------------

Plaintiff PHOENIX SHIPPING CORPORATION (hereinafter "PHOENIX"), for its Verified Complaint against Defendant DHL GLOBAL FORWARDING (PTY) LTD, a/k/a DHL INDUSTRIAL PROJECTS DIVISION, JOHANNESBURG (hereinafter "DHL GLOBAL PTY"), alleges upon information and belief as follows:

1.  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201, *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1, *et seq.*

NYDOCS1/308099.1

2.  At all times material hereto, Plaintiff PHOENIX was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at P.O. Box 211, Umdloti Beach 4350, Kwazulu-Natal, Republic of South Africa.

3.  At all times relevant hereto, Defendant DHL GLOBAL PTY was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 10 Patrick Road, Jet Park, Boksburg, Republic of South Africa.

4.  On or about March 25, 2008, Defendant DHL GLOBAL PTY, acting as an agent for non-party Bateman Engineered Technologies, entered into a firm booking note on the CONLINEBOOKING 2000 form with Plaintiff PHOENIX, as carrier, for the ocean transport of a cargo of 1,711 ftons of ball mill shells and accessories aboard the M/V COS PROSPERITY from Shanghai, China to Durban, South Africa.

5.  Under the terms of the contract, Defendant DHL GLOBAL PTY was obligated to pay freight at the agreed lumpsum rate upon loading of the cargo.

6.  In addition, under the terms of the contract, Defendant DHL GLOBAL PTY was obligated to tender a minimum of 1,700 ftons of cargo to the vessel when the vessel was ready to load and as fast as the vessel could receive the cargo.

7.  In the event DHL GLOBAL PTY failed to tender the cargo when the vessel was ready to load or failed to load as fast as the vessel could receive the cargo, the contract provided that PHOENIX was entitled to leave the port without further notice and DHL GLOBAL PTY was liable for deadfreight and/or any overtime charters, losses, costs and expenses incurred by PHOENIX.

8.  Plaintiff PHOENIX tendered the M/V COS PROSPERITY in ready condition to load the contemplated cargo at the port of Shanghai, and duly performed all of its duties under the terms of the contract.

9.  In breach of the contract, DHL GLOBAL PTY failed to tender any cargo to the vessel and as such, is liable to PHOENIX for deadfreight in the amount of $253,674 (calculated at the rate of $149.22 per fton of cargo multiplied by the required minimum quantity of 1,700 ftons).

10. In further breach of the contract, and despite due demand, DHL GLOBAL PTY has failed and/or otherwise refused to pay any amounts owed for deadfreight to PHOENIX, and the entire amount of $253,674 remains unpaid and owing under the terms of the contract.

11. The contract provides for the application of English law and disputes between the parties to be resolved by arbitration in London, and PHOENIX specifically reserves its right to arbitrate the substantive matters at issue.

12. This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for Plaintiff BELI's claim made or to be made in the London arbitration and under English law, as agreed by the parties. Arbitration has been commenced.

13. As a regular feature of English law, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the cost of the litigation, and interest, all of which constitutes a part of the Plaintiff's main claim and the amount sued for herein.

14. Plaintiff estimates, as nearly as can presently be computed, that the legal fees and costs of prosecuting their claims in London will be $125,000. Interest anticipated to be awarded is estimated to be $40,644.07 (calculated at the rate of 7.5% per annum compounded quarterly

for a period of two years on the principle claim of $253,674, the estimated time for completion of the proceedings in London).

15. In all, the claim for which Plaintiff PHOENIX sues in this action, as near as presently may be estimated, totals $419,318.07, no part of which has been paid by Defendant DHL GLOBAL PTY, despite due demand. Plaintiff PHOENIX specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure PHOENIX.

### Request for Rule B Relief

16. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff believes that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant DHL GLOBAL FORWARDING (PTY) LTD, a/k/a DHL INDUSTRIAL PROJECTS DIVISION, JOHANNESBURG (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name and/or being transferred for its benefit, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

17. The total amount sought to be attached pursuant to the above is **$419,318.07**.

WHEREFORE, Plaintiff PHOENIX SHIPPING CORPORATION prays:

a. That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

    b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$419,318.07** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant DHL GLOBAL FORWARDING (PTY) LTD, a/k/a DHL INDUSTRIAL PROJECTS DIVISION, JOHANNESBURG, including but not limited to ASSETS in its name and/or being transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

    c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any award entered against the Defendant in the London proceedings; and

    d.    For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
July 14, 2008

    FREEHILL HOGAN & MAHAR, LLP
    Attorneys for Plaintiff

By: _____
    Michael E. Unger (MU 0045)
    80 Pine Street
    New York, NY 10005
    (212) 425-1900

## ATTORNEY VERIFICATION

State of New York )
) ss.:
County of New York )

MICHAEL E. UNGER, being duly sworn, deposes and says as follows:

1. I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Michael E. Unger

Sworn to before me this
14th day of July, 2008

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/10

NYDOCS1/308099.1                         6

# ATTACHMENT B

ATT: Charles Wilcox

**Page 1**

| Agents (full style and address) | BIMCO LINER BOOKING NOTE<br>CODE NAME: "CONLINEBOOKING 2000" |
|---|---|
| Windward Shippping (Pty) Ltd<br>Suite 750,7th Floor<br>Mansion House<br>12,Field Street<br>Durban<br>South Africa | **Place and date**<br>Durban,South Africa - 20th March 2008 |
| | **Vessel**<br>Mv'Cos Prosperity' - see Clause 21 |
| **Carrier** (full style and address)<br>DHL Industrial Projects South Africa (A Division of)<br>DHL Global Forwarding SA (Pty) Ltd<br>10,Patrick Road<br>Jet Park. Boksburg<br>Johannesburg<br>South Africa | **Time for shipment (about)**<br>Laycan 28 March - 5 April 2008 |
| | **Port of loading****<br>Shanghai,China (Carrier's Berth) |
| | **Port of discharge**<br>Durban,South Africa (Carrier's Berth) |
| **Merchant*** (full style and address)<br>Bateman Projects Limited<br>Barlett Road<br>Boksburg. Johannesburg<br>South Africa | Merchant's representatives at loading port (full style and address) |

| Container No./Seal No./Marks and Numbers (if available) | Number and kind of packages, description of cargo | Gross weight, kg (if available) | Measurement, m³ (if available) |
|---|---|---|---|
| | A PART CARGO TOTALING ABOUT 691MT/1,703CBM/<br>1,711FTONS OF BALL MILL SHELLS AND ACCESSORIES<br>DETAILS AS PER ATTACHED P/LISTS MAX PW 42MT<br><br>CARGO IS PARTLY STACKABLE/OVER STOWABLE,WITH<br>CERTAIN LOOSE/UNPROTECTED ITEMS,BUT IS OTHER-<br>WISE SUITABLY PACKAGED AND PREPARED FOR<br>OCEAN TRANSPORTATION | | |

| Freight details and charges<br>Basis a minimum of 1,700ftons US$ 165 w/m all-in Full Liner Terms hook/hook | Special terms, if agreed<br>Additional Clauses 19 to 38 are deemed to be incorporated in this Booking Note. |
|---|---|
| Freight (state prepayable or payable at destination)<br>See Clause 19 | |

It is hereby agreed that this Contract shall be performed subject to the terms contained on Page 1 and 2 hereof which shall prevail over any previous arrangements and which shall in turn be superseded (except as to deadfreight) by the terms of the Bill of Lading.

| Signature (Merchant) | Signature (Carrier) |
|---|---|
| | |

*As defined hereinafter (Cl. 1)

**(or so near thereunto as the Vessel may safely get and lie always afloat)

This document is a computer generated CONLINEBOOKING 2000 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## ADDITIONAL CLAUSES TO DHL INDUSTRIAL PROJECTS/BATEMAN PROJECTS LIMITED CONLINE BOOKING NOTE 2000 DATED 20th MARCH 2008 / MV'COS PROSPERITY'

*Clause 19 :*
Freight to be fully prepaid in US Dollars to Carrier's nominated a/c within 5 banking days from completion of loading, and always prior signing/ releasing bill(s) of lading marked " freight prepaid ". Freight is earned on pro-rata loading, discountless and non- returnable, vessel and/or cargo lost or not lost.

*Clause 20:*
With the exception of the motors and electrical panels/parts Carrier has the option to load/stow cargo ondeck at Merchant's /Shipper's risk, liability,and expense,and bill(s) of lading to be so claused.

*Clause 21: - Vessel's Description*

M. os Prosperity' Single Deck Bulk Carrier (SDBC)
Built 2006 Singapore Flag
55,000mtdwt on 12.5m SSW
Loa/Bm 189.90/32.26m
5 hold/hatch Grain 69,450cbm
Cranes 4 x 30mt

*Clause 22:*
At load and discharge ports Carrier's berth/agent/stevedores both ends.

*Clause 23:*
Carrier's liner bill of lading form.

*Clause 24:*
Taxes/Dues/Duties/Wharfages on cargo or calculated on same, including all local terminal handling charges,to be for Merchant's account both ends.

*Clause 25:*
Taxes/Dues/Duties/Wharfages on vessel and/or freight, or calculated on same, to be for Carrier's account both ends.

*Clause 26:*
At load and discharge ports hooking on and off to be at Merchant's arrangement and expense.

*Clause 27:*
At load and discharge ports Merchant to deliver/receive cargo alongside vessel,within reach of ship's tackle,as fast as the vessel can receive/deliver Saturdays,Sundays,Holidays included,as per Custom of the Port,otherwise Carrier entitled to claim damages for detention.

*Clause 28 :*
At load and discharge ports Carrier at their arrangement and expense to provide all necessary/required stevedoring equipment including wires/wire slings/spreaders/shackles for loading and discharging.

*Clause 29:*
Any special saddles and/or cradles required to support the cargo to be at Merchant's arrangement and expense.Cargo to be fitted with suitable lashing,tie down,lifting points, and/or other adequate means of lifting ,and centre of gravity to be clearly indicated allowing Carrier to lift the cargo in equilibrium.

*Clause 30 :*
Detention USD 52,000 pdpr.

*Clause 31:*
At load and and discharge ports any/all time lost waiting for berth to be at Carrier's risk and expense.

*Clause 32:*
Any floating/shoreside cranes required for loading/discharging to be at Carrier's arrangement and expense.

*Clause 33:*
Carrier to provide Merchant with 7,5,3,2,1 days notice of said vessel's ETA at both load and discharge ports.

*Clause 34:*
Carrier to guarantee that performing vessel has full and valid P+I cover, and such cover to be maintained during the currency of this charter.

*Clause 35:*
U' aw /London Arbitration under prevailing LMAA rules, with small claims procedure for claims/counter claims under USD 50,000 to apply.

*Clause 36:*
Merchant is allowed to have 1 surveyor onboard the vessel at load and discharge ports before, after, and during loading/discharging, at surveyor's own risk and expense without liability to the Carrier. The surveyor is entitled to inspect/examine/take pictures of the cargo after loading/securing has been completed at load port, and prior to unlashing/discharging has commenced at discharge port,but is otherwise not to interfere in cargo operations.

*Clause 37:*
BIMCO Clauses to apply: Voywar 2004,ISPS,and AMS.

*Clause 38 :*
All details of this fixture are to be kept strictly private and confidential.

_____                    _____
Fr and behalf of the Carrier                  For and behalf of the Merchant

**FULL TERMS OF THE CARRIER'S BILL OF LADING FORM\*** Page 2

**1. Definition.**
"Merchant" includes the shipper, the receiver, the consignor, the consignee, the holder of the Bill of Lading, the owner of the cargo and any person entitled to possession of the cargo.

**2. Notification.**
Any mention in this Bill of Lading of parties to be notified of the arrival of the cargo is solely for the information of the Carrier and failure to give such notification shall not involve the Carrier in any liability nor relieve the Merchant of any obligation hereunder.

**3. Liability for Carriage Between Port of Loading and Port of Discharge.**
(a) The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.
When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or, if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.
The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.
The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or with respect to deck cargo and live animals.
(b) If the Carrier is held liable in respect of delay, consequential loss or damage other than loss of or damage to the cargo, the liability of the Carrier shall be limited to the freight for the carriage covered by this Bill of Lading, or to the limitation amount as determined in sub-clause 3(a), whichever is the lesser.
(c) The aggregate liability of the Carrier and/or any of his servants, agents or independent contractors under this Contract shall, in no circumstances, exceed the limits of liability for the total loss of the cargo under sub-clause 3(a) or, if applicable, the Additional Clause.

**4. Law and Jurisdiction.**
Disputes arising out of or in connection with this Bill of Lading shall be exclusively determined by the courts and in accordance with the law of the place where the Carrier has his principal place of business, as stated on Page 1, except as provided elsewhere herein.

**5. The Scope of Carriage.**
The intended carriage shall not be limited to the direct route but shall be deemed to include any proceeding or returning to or stopping or slowing down at or off any ports or places for any reasonable purpose connected with the carriage including bunkering, loading, discharging, or other cargo operations and maintenance of Vessel and crew.

**6. Substitution of Vessel.**
The Carrier shall be at liberty to carry the cargo or part thereof to the Port of discharge by the said or other vessel or vessels either belonging to the Carrier or others, or by other means of transport, proceeding either directly or indirectly to such port.

**7. Transhipment.**
The Carrier shall be at liberty to tranship, lighter, land and store the cargo either on shore or afloat and reship and forward the same to the Port of discharge.

**8. Liability for Pre- and On-Carriage.**
When the Carrier arranges pre-carriage of the cargo from a place other than the Vessel's Port of loading or on-carriage of the cargo to a place other than the Vessel's Port of discharge, the Carrier shall contract as the Merchant's Agent only and the Carrier shall not be liable for any loss or damage arising during any part of the carriage other than between the Port of loading and the Port of discharge even though the freight for the whole carriage has been collected by him.

**9. Loading and Discharging.**
(a) Loading and discharging of the cargo shall be arranged by the Carrier or his Agent.
(b) The Merchant shall, at his risk and expense, handle and/or store the cargo before loading and after discharging.
(c) Loading and discharging may commence without prior notice.
(d) The Merchant or his Agent shall tender the cargo when the Vessel is ready to load and as fast as the Vessel can receive including, if required by the Carrier, outside ordinary working hours notwithstanding any custom of the port. If the Merchant or his Agent fails to tender the cargo when the Vessel is ready to load or fails to load as fast as the Vessel can receive the cargo, the Carrier shall be relieved of any obligation to load such cargo, the Vessel shall be entitled to leave the port without further notice and the Merchant shall be liable to the Carrier for deadfreight and/or any overtime charges, losses, costs and expenses incurred by the Carrier.
(e) The Merchant or his Agent shall take delivery of the cargo as fast as the Vessel can discharge including, if required by the Carrier, outside ordinary working hours notwithstanding any custom of the port. If the Merchant or his Agent fails to take delivery of the cargo the Carrier's discharging of the cargo shall be deemed fulfilment of the contract of carriage. Should the cargo not be applied for within a reasonable time, the Carrier may sell the same privately or by auction. If the Merchant or his Agent fails to take delivery of the cargo as fast as the Vessel can discharge, the Merchant shall be liable to the Carrier for any overtime charges, losses, costs and expenses incurred by the Carrier.
(f) The Merchant shall accept his reasonable proportion of unidentified loose cargo.

**10. Freight, Charges, Costs, Expenses, Duties, Taxes and Fines.**
(a) Freight, whether paid or not, shall be considered as fully earned upon loading and non-returnable in any event. Unless otherwise specified, freight and/or charges under this Contract are payable by the Merchant to the Carrier on demand. Interest at Libor (or its successor) plus 2 per cent. shall run from fourteen days after the date when freight and charges are payable.
(b) The Merchant shall be liable for all costs and expenses of fumigation, gathering and sorting loose cargo and weighing onboard, repairing damage to and replacing packing due to excepted causes, and any extra handling of the cargo for any of the aforementioned reasons.
(c) The Merchant shall be liable for any dues, duties, taxes and charges which under any denomination may be levied, inter alia, on the basis of freight, weight of cargo or tonnage of the Vessel.
(d) The Merchant shall be liable for all fines, penalties, costs, expenses and losses which the Carrier, Vessel or cargo may incur through non-observance of Customs House and/or import or export regulations.
(e) The Carrier is entitled in case of incorrect declaration of contents, weights, measurements or value of the cargo to claim double the amount of freight which would have been due if such declaration had been correctly given. For the purpose of ascertaining the actual facts, the Carrier shall have the right to obtain from the Merchant the original invoice and to have the cargo inspected and its contents, weight, measurement or value verified.

**11. Lien.**
The Carrier shall have a lien on all cargo for any amount due under this contract and the costs of recovering the same and shall be entitled to sell the cargo privately or by auction to satisfy any such claims.

**12. General Average and Salvage.**
General Average shall be adjusted, stated and settled in London according to the York-Antwerp Rules 1994, or any modification thereof, in respect of all cargo, whether carried on or under deck. In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Carrier is not responsible by statute, contract or otherwise, the Merchant shall contribute with the Carrier in General Average to the payment of any sacrifice, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the salving vessel or vessels belonged to strangers.

**13. Both-to-Blame Collision Clause.**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, negligence or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the Merchant will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her Owner in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owner of the cargo paid or payable by the other or non-carrying vessel or her Owner to the owner of the cargo and set-off, recouped or recovered by the other or non-carrying vessel or her Owner as part of his claim against the carrying vessel or Carrier. The foregoing provisions shall also apply where the Owner, operator or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**14. Government directions, War, Epidemics, Ice, Strikes, etc.**
(a) The Master and the Carrier shall have liberty to comply with any order or directions or recommendations in connection with the carriage under this Contract given by any Government or Authority, or anybody acting or purporting to act on behalf of such Government or Authority, or having under the terms of the insurance on the Vessel the right to give such orders or directions or recommendations.
(b) Should it appear that the performance of the carriage would expose the Vessel or any cargo onboard to risk of seizure, damage or delay, in consequence of war, warlike operations, blockade, riots, civil commotions or piracy, or any person onboard to risk of loss of life or freedom, or that any such risk has increased, the Master may discharge the cargo at the Port of loading or any other safe and convenient port.
(c) Should it appear that epidemics; quarantine; ice; labour troubles, labour obstructions, strikes, lockouts (whether onboard or on shore); difficulties in loading or discharging would prevent the Vessel from leaving the Port of loading or reaching or entering the Port of discharge or there discharging in the usual manner and departing therefrom, all of which safely and without unreasonable delay, the Master may discharge the cargo at the Port of loading or any other safe and convenient port.
(d) The discharge, under the provisions of this Clause, of any cargo shall be deemed due fulfilment of the contract of carriage.
(e) If in connection with the exercise of any liberty under this Clause any extra expenses are incurred they shall be paid by the Merchant in addition to the freight, together with return freight, if any, and a reasonable compensation for any extra services rendered to the cargo.

**15. Defences and Limits of Liability for the Carrier, Servants and Agents.**
(a) It is hereby expressly agreed that no servant or agent of the Carrier (which for the purpose of this Clause includes every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Merchant under this Contract of carriage for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment.
(b) Without prejudice to the generality of the foregoing provisions in this Clause, every exemption from liability, limitation, condition and liberty herein contained and every right, defence and immunity of whatsoever nature applicable to the Carrier or to which the Carrier is entitled, shall also be available and shall extend to protect every such servant and agent of the Carrier acting as aforesaid.
(c) The Merchant undertakes that no claim shall be made against any servant or agent of the Carrier and, if any claim should nevertheless be made, to indemnify the Carrier against all consequences thereof.
(d) For the purpose of all the foregoing provisions of this Clause the Carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who might be his servants or agents from time to time and all such persons shall to this extent be or be deemed to be parties to this Contract of carriage.

**16. Stowage.**
(a) The Carrier shall have the right to stow cargo by means of containers, trailers, transportable tanks, flats, pallets, or similar articles of transport used to consolidate goods.
(b) The Carrier shall have the right to carry containers, trailers, transportable tanks and covered flats, whether stowed by the Carrier or received by him in a stowed condition from the Merchant, on or under deck without notice to the Merchant.

**17. Shipper-Packed Containers, trailers, transportable tanks, flats and pallets.**
(a) If a container has not been filled, packed or stowed by the Carrier, the Carrier shall not be liable for any loss of or damage to its contents and the Merchant shall cover any loss or expense incurred by the Carrier, if such loss, damage or expense has been caused by:
(i) negligent filling, packing or stowing of the container;
(ii) the contents being unsuitable for carriage in container; or
(iii) the unsuitability or defective condition of the container unless the container has been supplied by the Carrier and the unsuitability or defective condition would not have been apparent upon reasonable inspection at or prior to the time when the container was filled, packed or stowed.
(b) The provisions of sub-clause (i) of this Clause also apply with respect to trailers, transportable tanks, flats and pallets which have not been filled, packed or stowed by the Carrier.
(c) The Carrier does not accept liability for damage due to the unsuitability or defective condition of reefer equipment or trailers supplied by the Merchant.

**18. Return of Containers.**
(a) Containers, pallets or similar articles of transport supplied by or on behalf of the Carrier shall be returned to the Carrier in the same order and condition as handed over to the Merchant, normal wear and tear excepted, with interiors clean and within the time prescribed in the Carrier's tariff or elsewhere.
(b) The Merchant shall be liable to the Carrier for any loss, damage to, or delay, including demurrage and detention incurred by or sustained to containers, pallets or similar articles of transport during the period between handing over to the Merchant and return to the Carrier.

**ADDITIONAL CLAUSE**
**U.S. Trade. Period of Responsibility.**
(i) In case the Contract evidenced by this Bill of Lading is subject to the Carriage of Goods by Sea Act of the United States of America, 1936 (U.S. COGSA), then the provisions stated in said Act shall govern before loading and after discharge and throughout the entire time the cargo is in the Carrier's custody and in which event freight shall be payable on the cargo coming into the Carrier's custody.
(ii) If the U.S. COGSA applies, and unless the nature and value of the cargo has been declared by the shipper before the cargo has been handed over to the Carrier and inserted in this Bill of Lading, the Carrier shall in no event be or become liable for any loss or damage to the cargo in an amount exceeding USD 500 per package or customary freight unit.

---

\*BIMCO LINER BILL OF LADING
Code Name: "Conlinebooking 2000"
Amended January 1950; August 1952; January 1973; July 1974; August 1976; January 1978; November 2000

This document is a computer generated CONLINEBOOKING 2000 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.