UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHOENIX SHIPPING CORPORATION,

                Plaintiff,

    -against-

DHL GLOBAL FORWARDING (PTY) LTD,
a/k/a DHL INDUSTRIAL PROJECTS
DIVISION, JOHANNESBURG,

                Defendant.

**08 Civ 6325 (RJS)**

**DECLARATION OF
JOSEPH MAYS**

---

JOSEPH MAYS, pursuant to Section 1746 of Title 28 of the United States Code, hereby declares and says the following under penalty of perjury:

    1.    I am a solicitor with Mays Brown Solicitors with a Registered Office at 66 Royal Mint Street, London E1 8LG, United Kingdom. I have been practicing as a qualified solicitor since 1991 and have specialized in shipping law from then until now.

    2.    Mays Brown Solicitors was retained by Phoenix Shipping Corporation in respect of a dispute arising out of the failure of Defendant DHL Global Forwarding (Pty) Ltd. ("DHL") to load a part cargo aboard the M/V COS PROSPERITY at Shanghai, China in March/April 2008.

    3.    I submit this Declaration in opposition to the motion filed by DHL in the Rule B attachment action brought by Phoenix in which DHL seeks to vacate the attachment of its funds. DHL's motion should be denied for the reasons explained below.

A Valid and Binding Contract Was Entered Between Phoenix and DHL

4.    On or about 25 March 2008, either on its own behalf or as agent for non-party Bateman Engineered Technologies, DHL entered into a contract of carriage with Phoenix for the ocean transport of a cargo of 1,711 ftons of ball mill shells and accessories aboard the M/V COS PROSPERITY from Shanghai, China to Durban, South Africa ("The Contract").   A copy of an email sent on 25 March 2008 at 09.11 by Windward Shipping, broker for DHL, recapping the terms of the contract and confirming a "FULLY FIRM booking" by DHL with Phoenix is attached to the Declaration of Barry Windrim as Exhibit 1.

5.    The recap records the main terms of The Contract between the parties and expressly incorporates the terms and conditions of the CONLINEBOOKING 2000 form. The Contract provides for "UK Law/London Arbitration under prevailing LMAA [London Maritime Arbitration Association] rules, with small claims procedure for claims/counterclaims under usd 50,000."   Notably the recap also expressly states that the Contract was for the "a/c [account of] DHL industrial Projects Div. Johannesburg".

6.    That recap asked for confirmation of agreement (which I take to mean agreement that it was an accurate recap of the binding contract reached) which was forthcoming at 15.53 the following day from Phoenix with the comment that a figure of USD52,000 needed to be inserted after "detention". As a matter of English law, the recap and/or surrounding correspondence/circumstances evince, record and/or contain, a valid and binding contract for the charter of space aboard the vessel despite that the recap is not signed by either party. I attach at Exhibit 1 hereto an extract from the Leading English law text book Voyage Charters by Cooke and Others. "So long as the parties have

reached complete agreement, a charterparty signed by or on behalf of the parties is unnecessary. The parties' agreement may be made in the course of written exchanges; or during conversations or meetings, and may even be inferred from conduct ..." Both Phoenix and Mr Winidrim seem to have treated this as a binding contract, no doubt because it was.

7.     DHL disputes that it is a party to The Contract, contending that it acted solely as agent for non-party Bateman Engineered Technologies. In English Law, when identifying the parties to a contract, the courts consider objectively the intention of the parties as reflected in the written contract against a commercial background. Where, as here, a contract is in writing, the mere fact that an apparent party to the contract is an agent, even if the other side knows that fact, is itself insufficient to negative personal liability of the purported agent.

8.     It was pointed out in Basma v Weeks [1950 AC 441] that there is nothing inconsistent in a person being in fact an agent yet entering into a contract as principal so as to render himself personally liable.

9.     I also note that the 20 March 2008 CONLINEBOOKING 2000 form appended as Exhibit B to DHL's Motion to Vacate contains the exact additional clauses as set forth in the recap. This evidences an intent by DHL to have sub-chartered to Bateman on back to back terms (which is often the case in the case of a chain of contracts of carriage), save for the $5/fton profit it stood to make, in order to protect itself and so as to be in a position to pass any claim either up or down the contract chain without being stuck with liability at the end of the day.

NYDOCS1/311024.1

10. Setting aside for the moment the clear statement in the recap that The Contract was for the account of DHL, Exhibit B provides additional support for the conclusion that DHL entered The Contract with Phoenix for its own account. First, I note that the freight rate set out in the booking note is $165/fton while the freight rate in the recap is for $160/fton. This suggests that DHL was acting to make a $5/fton profit on the exchange. It also names DHL as carrier. All of this is consistent with an arrangement where DHL secured space on the vessel via a binding contract between DHL and Phoenix and then sub-chartered out that space by a separate contract with Bateman at a profit.

11. Even if DHL did act as agent for Bateman in entering The Contract, this does not lead to the conclusion, as a matter of English law, that DHL cannot be liable for breach of The Contract. The CONLINEBOOKING note defines the "merchant" as including <u>both</u> the shipper and the owner of the cargo and any person entitled to possession. Thus there is a good faith argument that DHL is a party to The Contract as the shipper while Bateman is a party as owner of the goods. Accordingly, it is possible that Phoenix could succeed on a claim against either DHL or Bateman.

12. Based on the foregoing, I am convinced that there is a good arguable case as a matter of English law that DHL is potentially liable directly to Phoenix for breach of The Contract. Even if Phoenix knew that DHL were an agent generally for Bateman, which is denied, DHL entered into The Contract with Phoenix as principal and is bound by the terms of that agreement which includes English Law and London arbitration under prevailing LMAA rules.

<u>Claim That DHL Did Not Agree To Arbitrate</u>

13.   That DHL and its South African lawyer have denied that there was an agreement to arbitrate either in London or South Africa is of no moment. This will be seen as a challenge to the jurisdiction of the arbitrator. That a party disputes the tribunal's jurisdiction does not, however, prevent arbitration proceedings being commenced against them.

14.   Section 30 of the 1996 English Arbitration Act deals with jurisdictional issues relating to London Arbitrations.

> *30. - (1) Unless otherwise agreed by the parties, the arbitral tribunal may rule on is own substantive jurisdiction, that is, as to-*
>
> *<u>a) Whether there is a valid arbitration agreement.</u>*
> *b) Whether the tribunal is properly constituted, and*
> *c) What matters have been submitted to arbitration in accordance with the arbitration agreement.*
>
> *(2) Any such ruling may be challenged by any available arbitral process of appeal or review or in accordance with the provisions of this part.*

Thus, an arbitrator in this situation has the power to rule upon the existence or otherwise of the contract and agreement to arbitrate.

<u>Arbitration Has Been Commenced</u>

15.   As to DHL's argument that Phoenix has not commenced arbitration, this is patently false. In May 2008 there were a number of exchanges between South African lawyers representing Phoenix and DHL in response to Phoenix's suggestion that, notwithstanding the English Law and London arbitration clause in The Contract, the parties arbitrate the dispute in South Africa as a costs saving measure since both Phoenix and DHL are present there. DHL ultimately rejected this proposal.

16.   The Contract/recap does not state the number of arbitrators to be appointed nor the procedure in appointing them. Where a contract fails to specify the

NYDOCS1/311024.1

number of arbitrators to be appointed the tribunal shall consist of a sole arbitrator. Section 15(3) of the 1996 English Arbitration Act.

    17.    Accordingly, on 26 June 2008 my assistant Ryan Sheward, in accordance with Section 16(3) of the 1996 Arbitration Act, sent a telefax to Mr. William Fullard of Fullard Mayer Morrison, the South African attorneys for DHL, in which Phoenix requested that DHL agree to the joint appointment of one of three named arbitrators (or to put forward their own suggested arbitrators) to serve as sole arbitrator in an arbitration involving the deadfreight dispute to be held in London as per the terms of The Contract. Attached hereto as Exhibit 2 is a true and correct copy of the 26 June telefax.

    18.    As per Section 18 of the English Arbitration Act, the 26 June 2008 telefax to Mr. Fullard advised that unless DHL agreed to the appointment of one of the proposed arbitrators within 28 days Phoenix would apply to the English High Court to appoint an arbitrator.

    19.    By telefax dated 22 July 2008 Mr. Fullard acknowledged receipt of our 26 June correspondence. A copy of that correspondence is attached hereto as Exhibit 3. Mr. Fullard also advised that, notwithstanding DHL's position that a London arbitrator does not have jurisdiction to entertain the dispute, DHL had requested he instruct London solicitors. In view of this Mr. Fullard requested Phoenix take no further action until 8 August.

    20.    Whilst the extension until 8th August has expired, to date Phoenix has not submitted an application to the English High Court. Phoenix reserves the right to make the application should DHL not agree an arbitrator.

21.    That Phoenix has not taken the formalistic step of applying to the High Court to have an arbitrator appointed does not mean that arbitration has not been commenced. The arbitration was commenced by the sending of the 26 June 2008 telefax to DHL's attorney seeking agreement on the appointment of a sole arbitrator.

22.    I attach as Exhibit 4 hereto an extract from London Maritime Arbitration, a leading treatise on London arbitration, which explains that where the arbitrator or arbitrators are to be appointed by the parties, as in this case, arbitral proceedings are commenced when one party serves on the other party notice in writing requiring them to appoint an arbitrator or to agree to the appoint of an arbitrator in respect of that matter.

23.    There is no requirement as a matter of English Law that DHL's attorneys agree Phoenix has commenced arbitration to make it so. Accordingly, I am able to say that arbitration has indeed been commenced by Phoenix against DHL.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: London, England
August 20, 2008

_____
Joseph Mays

# EXHIBIT  1

## Declaration of Joseph Mays



# LONDON MARITIME ARBITRATION

## SECOND EDITION

CLARE AMBROSE
KAREN MAXWELL

CONSULTANT EDITOR
BRUCE HARRIS

    (a) was made without the required notice,

    (b) was outside the terms of the arbitration clause; or

    (c) could be challenged on grounds of bias or unsuitability.

Challenge to the appointment of an arbitrator could also be made by seeking his removal under section 24 on the grounds of:

    (a) impartiality,

    (b) lack of qualification;

    (c) physical or mental incapacity.

Permission to appeal to the Court of Appeal is required for any appeals from judicial remedies governing appointment.[50]

    A party must act promptly in making any objection to an appointment as failure to do so may preclude an objection being raised at a later stage[51] (see section 73 discussed in more detail in Chapter 10). This means that challenges to the appointment of an arbitrator should generally be made as soon as the ground for objection comes to light. Subject to this substantial limitation, challenge is available after an award is made by:

    (a) challenging the award on the ground of lack of substantive jurisdiction (see sections 67 and 72 of the 1996 Act discussed in Chapter 5);

    (b) challenging the award for serious irregularity (see section 68 discussed in Chapter 21).

Apart from relief sought under section 72, these challenges are subject to a 28 day time limit from the date of the award, or if there has been any arbitral process of appeal or review, from the date when the applicant was notified of the result of that process (see section 70(3)).

## 8. COMMENCING ARBITRATION FOR THE PURPOSE OF TIME LIMITS

The steps required to make a valid appointment for the purposes of ensuring that an arbitrator has power to bind the parties (i.e. for the purposes of jurisdiction) are not the same as the steps necessary for a claimant to interrupt a time limit for making a claim. The statutory definition of the commencement of an arbitration for the purpose of statutory time limits remains largely unchanged under the 1996 Act. Section 14 provides that:

"(1) The parties are free to agree when arbitral proceedings are to be regarded as commenced for the purposes of this Part and for the purposes of the Limitation Acts.

(2) If there is no such agreement the following provisions apply.

(3) Where the arbitrator is named or designated in the arbitration agreement, arbitral proceedings are commenced in respect of a matter when one party serves on the other parties a notice in writing requiring him or them to submit that matter to the person so named or designated.

---

50. See sections 17(4), 18(5), 21(6), 24(6), 32(6) and 67(4).

51. Section 73 of the 1996 Act. A party could possibly preserve its right to object on grounds of jurisdiction (see Chapter 5) if it took no part in the arbitration, see section 72.

(4) Where the arbitrator or arbitrators are to be appointed by the parties, arbitral proceedings are commenced in respect of a matter when one party serves on the other party or parties notice in writing requiring him or them to appoint an arbitrator or to agree to the appointment of an arbitrator in respect of that matter.

(5) Where the arbitrator or arbitrators are to be appointed by a person other than a party to the proceedings, arbitral proceedings are commenced in respect of a matter when one party gives notice in writing to that person requesting him to make the appointment in respect of that matter."

Paragraph 4 of the LMAA Terms makes clear that section 14 of the 1996 Act shall apply for the purpose of determining what dates arbitral proceedings are to be regarded as having commenced.

## What notice is required to commence arbitration?

Section 14 was intended to restate the previous law and the notice requirement closely follows the wording of the previous legislation.[52] In the absence of any other agreement, a party will only have effectively interrupted time for the purpose of statutory time limits if he gives the other side "notice in writing requiring him or them to appoint an arbitrator or to agree to the appointment of an arbitrator in respect of the matter". The law is somewhat uncertain as to exactly what this provision requires. The difficulty arises when a party has given the other side some form of notice, for instance notifying him that an arbitrator has been appointed, but has not expressly required him to appoint an arbitrator—is this sufficient to commence arbitration for the purpose of a statutory time limit?

In *Nea Agrex SA v Baltic Shipping Co*,[53] the claimants had sent a notice stating, "please advise your proposals in order to settle this matter, or name your arbitrators". The Court of Appeal considered that this was sufficient to commence arbitration for the purposes of the applicable Limitation Act (worded similarly to section 14 of the 1996 Act), even though the notice was conditional and the arbitration clause was to be construed as providing only for a sole arbitrator. Lord Denning MR held that a notice requiring a matter to be referred to arbitration would include a request "by implication" to agree to the appointment of an arbitrator.[54] Shaw LJ considered that it was necessary for the notice "in substance" to communicate that the claimant was invoking the arbitration agreement and required the other party to do something towards setting the arbitration in train.[55]

There is somewhat conflicting first instance authority on the weight to be given to *Nea Agrex SA v Baltic Shipping Co*[56] when interpreting section 14 of the 1996 Act.

In *Vosnoc Ltd v Trans Global Projects Ltd*[57] the claimants had sent the intended respondents a notice stating that "by this letter the dispute between our respective companies is referred to the arbitration of three arbitrators in London". Judge Raymond Jack QC decided that this was not sufficient to amount to commencement of arbitration within the meaning of section 14. He departed from the flexible view taken in the *Nea Agrex* case, instead holding that, "if a statutory provision provides for a notice requiring something, it is ordinarily to be expected that the notice must do so expressly". He considered that English law (unlike the Model Law) had taken a policy decision that the notice

---

52. Paragraph 76 of the DAC Report and section 27(3) of the 1939 Limitation Act and section 34(3) of the 1980 Limitation Act.

53. [1976] 2 Lloyd's Rep 47.

54. [1976] 2 Lloyd's Rep 47 at 51, Goff LJ agreed at 55 but did not consider it necessary to decide the point.

55. [1976] 2 Lloyd's Rep 47 at 58.

56. [1976] 2 Lloyd's Rep 47.

57. [1998] 1 Lloyd's Rep 711.

# EXHIBIT  2

## Declaration of Joseph Mays

# VOYAGE CHARTERS

BY

**JULIAN COOKE**
*of Lincoln's Inn, Barrister*

**JOHN D. KIMBALL**
*New York Attorney, Blank Rome, LLP*

**TIMOTHY YOUNG**
*of Gray's Inn, One of Her Majesty's Counsel*

**DAVID MARTOWSKI**
*New York Arbitrator and Mediator*

**ANDREW TAYLOR**
*London Solicitor, Richards Butler*

**LeROY LAMBERT**
*New York Attorney, Blank Rome, LLP*

## THIRD EDITION

## informa

LONDON
2007

or vessels to be nominated thereafter.[4] Since all contracts of carriage by sea may accurately be called "contracts of affreightment", contracts of this last kind are often referred to merely as "C.O.A.s"[5] in order to highlight their particular characteristics. It is common for single voyage charter forms to be adapted to cover multiple voyage contracts, and this can lead to particular difficulties concerning, for example, cancellation, liens and the effect of the Hague Rules when incorporated. These difficulties will be considered in the appropriate chapters below.

## CONCLUDING A BINDING AGREEMENT

**1.3**  A contract for the chartering of a ship is normally embodied in a printed form of charterparty, agreed by the parties or their agents. Under English law, however, there is no requirement that a contract for the services of a ship on a voyage should be made or recorded in any particular manner. So long as the parties have reached complete agreement, a charterparty signed by or on behalf of the parties is unnecessary.[6] The parties' agreement may be made in the course of written exchanges, or during conversations or meetings,[7] and may even be inferred from conduct, so long as the inference to be drawn is clear. All that is required is that the parties should have reached a firm agreement upon all essential terms. As Lord Blackburn said in *Rossiter* v. *Miller*[8]:

> "It is a necessary part of the plaintiff's case to show that the two parties had come to a final and complete agreement, for, if not, there was no contract. So long as they are only in negotiation either party may retract; and though the parties may have agreed on all the cardinal points of the intended contract, yet, if some particulars essential to the agreement still remain to be settled afterwards, there is no contract. The parties, in such a case, are still only in negotiation. But the mere fact that the parties have expressly stipulated that there shall afterwards be a formal agreement prepared, embodying the terms, which shall be signed by the parties does not, by itself, show that they continue merely in negotiation. It is a matter to be taken into account in construing the evidence and determining whether the parties have really come to a final agreement or not. But as soon as the fact is established of the final mutual assent of the parties so that those who draw up the formal agreement have not the power to vary the terms already settled, I think the contract is completed."

**1.4**  Those particulars which are "essential to the agreement" and which must therefore be settled before a binding contract exists, may fall into two categories, namely:

(i) terms which, if not settled, render the entire agreement unworkable, or void for uncertainty, with the result that the court is unable to enforce it, whatever the parties may have intended;

(ii) terms, the agreement upon which is regarded by the parties themselves as an essential prerequisite of the making of a binding contract.[9]

### Matters which must be agreed if the contract is not to be unworkable or void for uncertainty

**1.5**  As Bingham J. said in *Pagnan* v. *Feed Products*,[10] "the parties are to be regarded as masters of their contractual fate" and it is primarily up to them whether agreement upon any

---

4. E.g. *The Kriti Rex* [1996] 2 Lloyd's Rep. 171.

5. *Ibid.* p. 174.

6. *Lidgett* v. *Williams* (1845) 4 Hare 456, 462. For the requirements necessary for a "charterparty" to be incorporated into a bill of lading see Chap. 18 below.

7. See, e.g., Arbitration 12/94 [1994] L.M.L.N. 387.

8. (1878) 3 App. Cas. 1124, 1151.

9. See *Pagnan* v. *Feed Products* [1987] 2 Lloyd's Rep. 601, 619, *Spectra International* v. *Tiscali* [2002] All E.R. (D) 209.

10. *Ibid.* at p. 611.

# EXHIBIT 3

**Declaration of Joseph Mays**



# MAYS BROWN

S O L I C I T O R S

**18b Ensign Street, London E1 8JD**

Tel :    +44 (0) 20 7264 0600

**Fax :**    +44 (0) 20 7264 0601

eMail :    res@maysbrown.com

## FACSIMILE TRANSMISSION

The information contained in this fax is confidential and may also be legally privileged.  It is only for the use of the intended recipient.  If you are not the named or intended recipient, please notify us immediately so that we can arrange for its return.  In such an event, you must not use or disclose the contents of this fax to any other person.  If any part of this message is incomplete or missing please call +44 (0) 20 7264 0600.

| **To :** | William Fullard | **Your Ref :** | AN/08/49 |
|---|---|---|---|
| **Fax No :** | 0027117832499 | | |
| **From :** | Ryan Sheward | **Our Ref :** | GRB/002 |
| **Pages :** | (2 including this one) | **Date :** | 26 June 2008 |

Dear Sirs,

### "COS PROSPERITY" C/P dd 25.03.08

We represent Phoenix Shipping Corporation, the Disponent Owners of the above vessel. By a firm fixture on 25 March 2008 between our clients and DHL Global Forwarding (Pty) Ltd's Industrial Projects Division ("DHL") and/or Bateman Engineering Technologies ("Bateman") DHL and/or Bateman agreed to load 1703 cubic metres of ball mill shell cargo for carriage from China to South Africa. Freight was to be pre-paid, and the vessel accordingly presented for loading as per the fixture.

In breach of the fixture, however, no cargo was loaded and our clients suffered a loss amounting to USD 253,674.00 due to the absence of the cargo.

The charterparty provides for London Arbitration in the event of any disputes between the parties.

We, on behalf of our clients now call upon both DHL and Bateman to join with us in appointment of a sole arbitrator in accordance with the provisions of Section 16 of the Arbitration Act 1996.

Since the issues will be the same as against both parties, it makes sense for all of us to agree to a common tribunal. We accordingly ask that you agree to the joint appointment of either Mr David Aikman or Mr Bruce Buchan or Mr Patrick O' Donovan as the sole arbitrator in relation to any and all disputes arising under or in connection with the above fixture.

We herby give you notice to either agree to one of the above gentleman or to put forward your suggestions within 28 days. Failure to do so will result in our taking steps under Section 18 of the Arbitration Act 1996 to apply to court to appoint an arbitrator, in which event we will claim the costs associated with that exercise from yourselves.

- 2 -

Please acknowledge receipt of this notice on behalf of your clients.

Kind Regards

Ryan Sheward

**Ryan Sheward**

| | |
|---|---|
| **From:** | Ryan Sheward |
| **Sent:** | 26 June 2008 10:25 |
| **To:** | 'fullard@fullardmayer.co.za' |
| **Subject:** | "COS PROSPERITY" C/P dd 25.03.08 |

Dear Sirs,

We represent Phoenix Shipping Corporation, the Disponent Owners of the above vessel. By a firm fixture on 25 March 2008 between our clients and DHL Global Forwarding (Pty) Ltd's Industrial Projects Division ("DHL") and/or Bateman Engineering Technologies ("Bateman") DHL and/or Bateman agreed to load 1703 cubic metres of ball mill shell cargo for carriage from China to South Africa. Freight was to be pre-paid, and the vessel accordingly presented for loading as per the fixture.

In breach of the fixture, however, no cargo was loaded and our clients suffered a loss amounting to USD 253,674.00 due to the absence of the cargo.

The charterparty provides for London Arbitration in the event of any disputes between the parties.

We, on behalf of our clients now call upon both DHL and Bateman to join with us in appointment of a sole arbitrator in accordance with the provisions of Section 16 of the Arbitration Act 1996.

Since the issues will be the same as against both parties, it makes sense for all of us to agree to a common tribunal. We accordingly ask that you agree to the joint appointment of either Mr David Aikman or Mr Bruce Buchan or Mr Patrick O' Donovan as the sole arbitrator in relation to any and all disputes arising under or in connection with the above fixture.

We herby give you notice to either agree to one of the above gentleman or to put forward your suggestions within 28 days. Failure to do so will result in our taking steps under Section 18 of the Arbitration Act 1996 to apply to court to appoint an arbitrator, in which event we will claim the costs associated with that exercise from yourselves.

Please acknowledge receipt of this notice on behalf of your clients.

Kind Regards

**Ryan Sheward**
**MAYS BROWN SOLICITORS**
18b Ensign Street
London
E18JD
Tel - + +44 207 264 0600
Fax -+ +44 207 262 0601

www.maysbrown.com

The information contained in this email is confidential and may also be legally privileged. It is only for the use of the intended recipient. If you are not the named or intended recipient, please notify us immediately. In such an event, you must not use or disclose the contents of this email to any other

person.

This firm is regulated by the Solicitors' Regulation Authority. A list of partners' names is available on request.

26/06/2008

# EXHIBIT  4

**Declaration of Joseph Mays**



**FULLARD · MAYER · MORRISON**

ATTORNEYS

**Mays Brown Solicitors**
**Fax No.: +44 (0) 20 7264 0600**

| | |
|---|---|
| *Our ref* | **D770/W Fullard/rp** |
| *Your ref* | **Ryan Sheward** |
| *Date* | **22 July 2008** |

**Dear Sirs**

*Regarding*     **OUR CLIENT:  DHL GLOBAL FORWARDING SA (PTY) LTD**
**YOUR CLIENT:  PHOENIX SHIPPING CORPORATION**

1.    We acknowledge receipt of your telefax dated 26th June 2008.

2.    We should just perhaps note, at the outset, that we act only for DHL Global Forwarding SA (Pty) Ltd and that we do not purport to represent Bateman.

3.    Bateman has to date been represented in this matter by Webber Wenzel with details as follows:

       Junaid Banoobhai
       Partner
       Webber Wentzel
       10 Fricker Road, Illovo Boulevard, Johannesburg, 2196 P O Box 61771, Marshalltown 2107
       Direct Tel:  +27 11 530 6818
       Direct Fax:  +27 11 530 6818
       Switchboard:  +27 530 5000
       E-mail:  junaid.banoobhai@webberwentzel.com
       Web:  www.webberwentzel.com
       Mobile:  083 270 1117

4.    Our client's response to your client's claim is already a matter of record (addressed in correspondence to your client's South African Attorneys, Garlicke and Bousfield) and we do not intend repeating that response here.

5.    Suffice it to say that our client denies that a London arbitrator has any jurisdiction to entertain the dispute.

6.    Our client has nevertheless requested us to instruct English solicitors in view of your client's attempt to have the dispute referred to arbitration in London.

7.    As presently advised, it appears that Holman Fenwick and Willan will be instructed.  We will get confirmation of this early next week.

Telephone +27 11 884 4415
Fax +27 11 783 2499
e-Mail fullard@fullardmayer.co.za
Docex 26 Sandton Square

Fullard Mayer Morrison Incorporated  *Reg No 1999/026700/21*
William Fullard  *BA LLB (Wits)* · Richard Mayer  *MA LLB (Wits)*
Mitchell Morrison  *BCom LLB (Rhodes)* · Aadil Lambat  *B Proc (Unisa)*

2nd Floor, Office Tower, Sandton City
Cnr Rivonia Road & Fifth Street, Sandton
PO Box 78678 Sandton 2146



8.    In view of this, we would suggest, without prejudice to our client's rights, that you pend your file and take no further action until Friday 8th August 2008 so as to enable the solicitors that will be instructed by our client to correspond further with you on this issue.

Yours faithfully
**FULLARD MAYER MORRISON INC.**

Per: